UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LAURA TORAN,

                        Plaintiff,

-against-

THE COUNTY OF NASSAU, SERGEANT GIRON, Individually and in his Official Capacity as a Sergeant in the Nassau County Police Department, and POLICE OFFICER DOLAN, Individually and in her Official Capacity as a Police Officer in the Nassau County Police Department,

                        Defendants.
------------------------------------------------------------------------X

For Online Publication Only

**MEMORANDUM & ORDER**
21-CV-5159 (JMA) (JMW)

FILED
CLERK

1:28 pm, Mar 18, 2024

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**AZRACK, United States District Judge:**

Plaintiff Laura Toran ("Plaintiff") alleges she was raped on November 22, 2017 and that a Nassau County police officer ignored her initial attempt to report the rape later that day. When Plaintiff subsequently reported the crime to the Special Victims Unit in 2019, it opened an investigation but subsequently closed it in December 2020 without any resulting criminal charges. Plaintiff contends the actions of Defendant Nassau County and two individual defendants—Police Officer Dolan and Sergeant Giron—violated Plaintiff's constitutional rights under the First, Eighth, and Fourteenth Amendments and state law.

Defendants have moved to dismiss Plaintiff's Complaint, (ECF No. 1(. For the reasons stated below, the Court dismisses Plaintiff's federal claims and declines to exercise supplemental jurisdiction over her state law claims.

                        **I.      BACKGROUND**

**A. <u>The November 22, 2017 Rape</u>**

In 2017, Plaintiff's parents owned a property at 10 Charles Street in Merrick ("10 Charles Street")—where Plaintiff and her family had lived for many years. (Compl., ECF No. 1 ¶ 19.)

Sometime in 2017, after Plaintiff's parents purchased another home, they became interested in selling 10 Charles Street to a cash buyer. (Id.) A pawn broker introduced Plaintiff's parents to Jerry Yedid, who agreed to buy 10 Charles Street for cash. (Id.) The closing was to occur on November 22, 2017. (Id.)

In 2017, two other individuals were also living in 10 Charles Street. (Id. ¶ 20.) The first individual was Cheryl Asman, a former high school classmate of Plaintiff's mother who had been staying at the house as a guest since September 2017. (Id. ¶ 21.) Plaintiff's mother had opened a business in June 2017, and Asman had been helping her with it. (Id.)

The second individual was Theodore Pruett, a tenant who lived in the back of the house. (Id.) Pruett received disability payments as a veteran and "panhandled for extra money." (Id.) At the apparent behest of Plaintiff's parents, Asman had served Pruett with a thirty-day notice to vacate the premises prior to the November 22, 2017 closing date. (Id.) Pruett, however, refused to leave until he reached an agreement with Jerry Yedid. (Id.) Jerry Yedid ultimately agreed to pay Pruett $5,733 to vacate the premises. (Id.) Although Plaintiff's parents were not aware of this arrangement before the closing, "Jerry Yedid . . . got this money at the closing, despite the objections of Plaintiff's parents." (Id.)

The closing for the house occurred on November 22, 2017. Plaintiff's parents attended the closing, which occurred at their attorney's office in Amityville. (Id. ¶ 21.) Plaintiff alleges that while her parents were at the closing, she was raped by Pruett and Jake Yedid, Jerry Yedid's son. (Id. ¶ 21.) Prior to the date of the closing, Jake Yedid had previously visited the house to speak with Pruett. (Id. ¶ 20.)

On the day of the closing, Asman helped Plaintiff pack up her belongings. (Id. ¶ 21.) As soon as Plaintiff's parents left to attend the closing, Pruett and Jake Yedid entered the house by

2

using a credit card or other device to open a locked side door. (Id.) Pruett grabbed Plaintiff by the throat and dragged her into his bedroom at the back of the house. (Id.) In addition to Jake Yedid, three unknown "African-American men" were also present and one of them had a gun.[1] (Id.) Plaintiff believes that these three men were Pruett's drug dealers. (Id.)

Pruett "raped the Plaintiff vaginally and anally, and stuck his fingers inside the Plaintiff's vagina." (Id.) Prior to this, Plaintiff was a virgin. (Id.) "The three African-American men held the Plaintiff down while she was raped by [Pruett]." (Id.) Jake Yedid then raped Plaintiff in the bathroom. (Id.)

Asman ran upstairs into Plaintiff's bedroom. (Id.) Plaintiff eventually ran upstairs to get Asman to help her. (Id.) The men then all followed her upstairs into her bedroom. (Id.) In the bedroom, "the three African-American men" again held Plaintiff down while Pruett raped her once more. (Id.) Asman "then took an active role by using a pen to penetrate the Plaintiff's vagina and anus" while she was "being held down by the three African-American men." (Id.) "One of the African-American men then gave the Plaintiff a gun so that she could kill herself." (Id.) Plaintiff alleges that, at some point, she was able to kick Pruett in the scrotum and was able to run out of the house. (Id.) Although Pruett "had grabbed [her phone] from her," Plaintiff also "fought to get it back" prior to leaving 10 Charles Street. (Id.)

After escaping, Plaintiff ran to a restaurant down the road to call 911. (Id.) Nassau County Police Officer Dolan—who works at the Seventh Precinct—responded to Plaintiff's call and met her at the restaurant. (Id. ¶ 22.) There, Officer Dolan told Plaintiff: "We can't help you because of your mother." (Id.) Officer Dolan then took Plaintiff back to 10 Charles Street. (Id.) When

---

[1] The Complaint states Jake Yedid is "white." (Id. ¶ 21.)

3

they arrived, Pruett and Asman were still at the house. (Id.) The other four individuals, however, had left. (Id.) After Officer Dolan dropped off Plaintiff, she gave Plaintiff a blank piece of paper, told her "Here is your report," and then laughed at Plaintiff and told her to "Fuck off" before driving away. (Id.) Pruett and Asman laughed at Plaintiff after seeing the officer's behavior towards Plaintiff. (Id.)

Plaintiff was so traumatized by the rape and Officer Dolan's actions that she "shut down" and "did not report the rape to anyone else for two years." (Id.)

Asman has had phone conversations with Plaintiff, in which Asman told her not to say anything about what happened that day. (Id.)

### B. Prior Interactions Between Plaintiff's Mother and Seventh Precinct Officers

Plaintiff alleges that Officer Dolan's statements and actions were a result of several prior incidents involving Plaintiff's family and the Seventh Precinct. (Id. ¶ 23.)

On May 6, 2016, for example, Plaintiff's mother called the Seventh Precinct because Plaintiff had been awoken during the night up by men speaking and doing something to her father's car. (Id.) When police arrived, they refused to give Plaintiff's mother a vandalism report. (Id.) Plaintiff's parents subsequently learned that a "fuse harness had been removed from the car." (Id.) So they again informed the precinct, with the hope to obtain a vandalism report for their insurance company. (Id.) But the police again refused. (Id.) When Plaintiff's mother complained, an officer —Lieutenant Bynes—told her that if she called again an ambulance and police car would take her to the Nassau Community Medical Center. (Id.) After that conversation, the Seventh Precinct called Plaintiff's mother and told her that they would be coming over to the house with a vandalism report. (Id.) Later, a uniformed officer and plain-clothed man arrived at 10 Charles Street and asked if they could walk around. (Id.) The plain-clothed man then gave Plaintiff's mother several

4

unspecified violations, and the officer laughed when the two men drove away. (Id.) The police were called again on May 13. They came back to the house and remained outside for two hours without taking a report. (Id.) Plaintiff's mother eventually complained about Lieutenant Bynes. (Id.) Plaintiff alleges, on information and belief, that Lieutenant Bynes was disciplined because of her mother's complaint. (Id.)

In December 2016, Plaintiff's mother was driving home when she stopped to allow three ducks to cross the street. (Id.) A woman named Kathy Tener thought Plaintiff's mother was stopping in front of her house and started videotaping Plaintiff's mother. (Id.) Twenty years earlier, Tener and Plaintiff's mother had been involved in a verbal dispute at the town library. (Id.) When Plaintiff saw Tener videotaping, she gave Tener the middle finger, got out of the car, and walked backed to 10 Charles Street. (Id.) Plaintiff's mother did not know why Plaintiff got out of the car, but before she could find out, two police cars appeared and blocked Plaintiff's mother's car. (Id.) The officers told Plaintiff's mother that she was "Harassing Kathy," but no summonses were issued. (Id.) Plaintiff alleges, on information and belief, that Tener has friends in the Seventh Precinct. (Id.)

Plaintiff's Complaint also alleges, without any further elaboration, that several other minor incidents occurred in 2017, "in which police acted in a manner consistent with a precinct-wide agenda against Plaintiff's mother and her family." (Id.)

**C. The Special Victims Unit's Investigation**

Sometime in 2019, Plaintiff told her parents about the rape, and they sought out police assistance. (Id. ¶ 22.) The Nassau County Special Victims Unit handled the investigation into Plaintiff's allegations. (Id. ¶¶ 18, 24.)

5

On November 6, 2019, Detective Ramos was designated as the lead detective on the case. (Id. ¶ 24.) Plaintiff's mother asked that a female detective speak to Plaintiff, but Detective Ramos stated that Plaintiff had to speak to him. (Id.) The Complaint does not allege that Plaintiff herself ever asked to speak with a female detective.

During the investigation, Plaintiff gave "statements" to the police. (Id.) But she was "reluctant to provide all the details" contained in the instant Complaint because she did not feel comfortable with a male detective. (Id.) The Complaint does not identify what information she told investigators and what information she withheld from them.[2] (Id.)

At some point during the investigation, Detective Hoovert (a female detective) was briefly involved and called Plaintiff's mother to express empathy for Plaintiff. (Id.) "When Defendant Sergeant Giron learned this, he first tried to deny it took place and then prevented Detective Hoovert from having any involvement in the investigation."[3] (Id.)

On December 16, 2020, Sergeant Giron informed Plaintiff and her mother that the Special Victims Unit would not be "pursuing charges." (Id. ¶¶ 18, 24.) Sergeant Giron told Plaintiff's mother: "[W]e believe your daughter but we do not have any physical evidence." (Id. ¶ 24.) Sergeant Giron also allegedly told Plaintiff's mother that "he notified the precincts in Nassau County not to talk to her anymore and said that 'everyone knows that Laura was raped.'" (Id.)

---

[2] Plaintiff's reticence to share information with investigators is reinforced by statements in Plaintiff's pre-motion conference letter, in which her attorney admitted that he "received much of the information that formed the basis of the claims from Plaintiff's mother." (ECF No. 17.) Plaintiff's opposition brief indicates that Plaintiff's mother is now deceased. (Pl. Opp'n Mem. at 13.)

[3] Plaintiff's Complaint also alleges, confusingly, that, "[a]lthough the Plaintiff gave statements to the police, she was never provided a female detective although requested by Plaintiff's mother until Detective Ramos said it was allowed." (Id. ¶ 24 (emphasis added).) The Complaint does not identify whether the female detective "allowed" by Ramos was Detective Hoovert or a different detective. Nor does the Complaint allege when this occurred. (Id.)

6

Plaintiff also alleges, based on information and belief, that Sergeant Giron told Detectives Ramos and Hoovert not to speak with Plaintiff's mother during the investigation. (Id.)

Plaintiff's Complaint cites to alleged flaws in the investigation performed by the Special Victims Unit and points to evidence that Plaintiff contends should have resulted in the arrest and prosecution of Plaintiff's rapists and their accomplices. Notably, however, Plaintiff's Complaint does not allege: (1) whether the police interviewed (or sought to interview) Asman, Pruett, Jake Yedid, Officer Dolan, or any other witnesses while the year-long investigation was pending; and (2) what, if anything, anyone told investigators when interviewed. Instead, Plaintiff's Complaint points to the following.

First, Plaintiff alleges that she told "Defendants that she made a 911 call on the date of the rape, but" that unidentified "police officials had denied that she made a 911 call, in an effort to cover up the actions of" Officer Dolan. (Id. ¶ 24.)

Second, Plaintiff alleges that she still has her phone from the day of the rape and that Pruett's fingerprints may be on it. (Id.) Plaintiff, however, does not allege how she handled the phone during the two years after the incident or allege facts to suggest that Pruett's fingerprints were likely to have been preserved two years later. It is also notable that Plaintiff's Complaint—which concedes she did not tell investigators all the details set out therein—does not indicate what, if anything, she told the officers about this cell phone evidence.

Third, Plaintiff alleges, upon information and belief, that Pruett has an unspecified violent history. (Id.)

Fourth, Plaintiff points to additional evidence she claims the detectives should have used in their investigation. Specifically, she alleges:

> Although Defendant Police Officer Dolan refused to take the Plaintiff to the hospital that day, the Plaintiff's fallopian tubes were damaged as a result of the rape.

7

> The Plaintiff was a virgin prior to the rape, so therefore any damage to the fallopian tubes, which are indicating of an infection caused by Theodore Pruett's dirty fingers when he raped the Plaintiff, could have been some evidence that could have been used by the Nassau County Police Department in their investigation.

(Id.)  But Plaintiff's Complaint does not indicate whether she informed the investigators of this injury or whether she provided investigators with relevant medical records.

### D. **The Instant Complaint**

On September 16, 2021, Plaintiff filed the instant lawsuit, which alleges federal and state claims against Officer Dolan, Sergeant Giron, and the County.

Plaintiff's Complaint lumps together—under a single purported "cause of action"—a confused jumble of federal claims.  Specifically, Plaintiff's "First Cause of Action" alleges:

> 25. Based on the forgoing, Defendants had probable cause to believe a crime had been committed against Plaintiff, yet intentionally and maliciously refused to assist Plaintiff.
>
> 26. Defendants had no reason to believe that Plaintiff was lying, yet failed to take action to assist her, with Defendant Police Officer Dolan claiming that she didn't like Plaintiff's mother.
>
> 27. The Defendants' actions were malicious, wanton and willful, and were taken in callous disregard as to whether Plaintiff's rights as a rape victim would be violated, and were done because the police officer did not like the Plaintiff's mother.
>
> 28. Plaintiff claims that the violations of Plaintiff's rights by the defendants constitute violations of 42 U.S.C. §§1981, 1983 and 1985 in that the Defendants deprived Plaintiff of her fundamental civil rights secured by the United States Constitution, including the First, Eighth and Fourteenth Amendments; that Defendants had no legal justification in failing to investigate and arrest, detain and prosecute Plaintiff's rapists and accomplices; that the Defendants conspired against Plaintiff to prevent her claims from being investigated; and that the malicious actions against Plaintiff, were violative of the most basic human and civil rights afforded citizens of the State of New York and of the United States. Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable. unconscionable and flagrant disregard of Plaintiff's rights, privileges, welfare and well-being. and the New York State Constitution.
>
> ****

      31. [Nassau County's] de facto policies, practices and customs include, inter alia: (l) the failure to properly screen, supervise, discipline, transfer, counsel, and/or otherwise control police officers engaged in sexist profiling against women who claim they were raped, in particular Plaintiff herein and allowing a culture to exist where local precincts can retaliate against citizens they don't like.

      32. Upon information and belief, the defendant THE COUNTY OF NASSAU failed to effectively screen, hire, supervise and discipline their police officers, including the defendant police officers herein, for sexist bias, particularly with respect to the treatment of women who claim they were raped, lack of truthfulness, and for their failure to protect citizens after they have been raped, thereby permitting and allowing the defendant police officers herein to be in a position to ignore complaints of rape if they don't like the complainant or her family.

      ****

      39. As a result of the foregoing, Plaintiff suffered mental anguish and depression as a result of the failure to investigate and prosecute her allegations, suffers from anxiety and mental anguish, intentional infliction of emotional distress and negligent infliction of emotional distress, including flashbacks, and has experienced reprisals in the form of ominous visits made to Plaintiff's home, and fears future reprisals from the officers involved in her investigation and was otherwise damaged in the sum of FIVE MILLION and 00/100 ($5,000,000.00) DOLLARS.

(Compl. ¶¶ 25–39.)[4]

## II. DISCUSSION

Defendants moved to dismiss all of Plaintiff's claims, arguing that: (1) Plaintiff's claims concerning Officer Dolan's actions in 2017 are time-barred; (2) Plaintiff's federal claims against both the individual defendants and the County fail to plausibly allege the denial of a constitutional right; and (3) Plaintiff has not alleged plausible state law claims. As explained below, the Court dismisses Plaintiff's federal claims and declines to exercise supplemental jurisdiction over all state law claims.

---

    [4] Paragraphs 29–38 contain additional allegations concerning Plaintiff's Monell claim against the County.

A.  **<u>Statute of Limitations</u>**

Defendants assert that Plaintiff's federal claims against Officer Dolan and the County—based on Officer Dolan's November 22, 2017 interaction with Plaintiff—are time-barred. The Court agrees.

Because Section 1983 does not contain a statute of limitations, "courts must borrow a state statute of limitations." <u>Kane v. Mount Pleasant Cent. Sch. Dist.</u>, 80 F.4th 101, 107 (2d Cir. 2023). "In New York, the statute of limitations for Section 1983 claims is New York's general statute of limitations for personal injury actions, N.Y. C.P.L.R. § 214(5), which is three years." <u>Id.</u>

New York, however, has a separate 20-year statute of limitations for civil claims involving sexual offenses.[5]  N.Y. C.P.L.R. § 213-c (McKinney). Plaintiff argues that N.Y. C.P.L.R. § 213-c applies to—and thus renders timely—her Section 1983 claims concerning Officer Dolan's conduct on November 17, 2017. This argument fails; C.P.L.R. § 213-c does not govern the timeliness of Section 1983 claims. <u>Doe v. NYS Off. of Child. & Fam. Servs.</u>, No. 20-CV-01195, 2021 WL 2826457, at *6 (N.D.N.Y. July 7, 2021); <u>see also</u> <u>Kane</u>, 80 F.4th at 108 (holding that New York statute which revived civil claims involving sexual offenses committed against minors did not apply to Section 1983 claims). Plaintiff's federal claims against Officer Dolan and the County based on the November 17, 2017 incident—which occurred more than three years before Plaintiff filed the Complaint on September 16, 2021—must be dismissed as time-barred.

In passing, Plaintiff also asserts that these claims should not be dismissed as time-barred because she was led to believe—between November 2019 and December 2020—that her

---

[5] In 2019, the statute of limitations for such claims was extended from five years to twenty years.

10

allegations were being actively investigated by the Special Victims Unit. Plaintiff contends that "it was only after [she] was informed that no action would be taken by the police to assist her that she decided she needed the assistance of an attorney." (Pl.'s Opp'n Mem. at 9.) Plaintiff, however, does not: (1) cite any caselaw in support of this argument; (2) identify what legal theory she seeks to advance in this effort to avoid the statute of limitations; or (3) explain why, in any event, it would be permissible for her to wait until September 2021—nine months after she learned the investigation had been closed—to bring her federal claims concerning the November 2017 incident. Accordingly, Plaintiff was waived or forfeited this perfunctory and undeveloped argument. See United States v. Stegemann, 701 F. App'x 35, 38 (2d Cir. 2017) (finding that "[t]he district court acted within its discretion by treating . . . perfunctory, undeveloped argument"—for which party did "not cite any supporting legal authority"—as "forfeited"); Lyn v. Inc. Vill. of Hempstead, No. 03-CV-5041, 2007 WL 1876502, at *16 (E.D.N.Y. June 28, 2007) ("Issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived . . . ." (cleaned up)), aff'd, 308 F. App'x 461 (2d Cir. 2009). Moreover, the Court does not find persuasive any of the grounds Plaintiff's papers suggest render her claims timely.

**B. Plaintiff's Remaining Section 1983 Claims Are Not Plausible**

Plaintiff's remaining federal claims against Sergeant Giron and the County—which concern the Special Victims Unit's investigation that began in 2019 and ended in December 2020—are timely. But they fail on other grounds.

To survive a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), a complaint must set forth "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007). "A claim has facial plausibility when the

11

plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A complaint "that offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557).

Defendants assert that Plaintiff's remaining federal claims do not plausibly allege a deprivation of a constitutionally protected interest. Defendant maintains that there is not a constitutionally protected right to have law enforcement investigate, arrest, and prosecute third parties. Plaintiff herself concedes that private citizens do not have a constitutional right to compel government officials to arrest or prosecute another person. (Pl. Opp'n Mem. at 10.) But Plaintiff tries another tack, arguing that she has alleged a plausible claim under the Second Circuit's decision in Myers v. County of Orange, 157 F.3d 66 (2d Cir. 1998).

In Myers, a District Attorney's Office promulgated a written policy which explicitly stated that "'[p]olice are directed not to entertain cross complaints'—i.e., any complaint by a person named as a wrongdoer in a prior related civilian complaint—until the initial complaint had been either dismissed or prosecuted." Id. at 66. There, police officers also testified that the police department had a "a similar, unwritten 'first-come first-served' complaint policy." Id. The Myers Court held that equal protection is violated when a police department's policy "favor[s] an initial complainant over a later one without giving primary regard to the particular facts involved in the case." Id. at 66. The Second Circuit reasoned that such a policy violates the Fourteenth Amendment because it "bears no rational relationship to the legitimate governmental interest in impartial law enforcement and thus violated Myers' right to equal protection." Id. at 76.

12

Plaintiff's allegations concerning Sergeant Giron and the Special Victims Unit's investigation do not state a plausible equal protection claim under Myers. The Complaint does not plausibly allege that Nassau County has any policy akin to the policy at issue in Myers. The Special Victims Unit accepted Plaintiff's Complaint, assigned a lead detective to her case, took multiple "statements" from her, and the investigation was pending for a year before the Unit informed Plaintiff that no charges would be brought. Moreover, as explained further below, Plaintiff has not even plausibly alleged that Sergeant Giron and the Special Victims Unit conducted an inadequate investigation. Plaintiff has not alleged a plausible Equal Protection claim against Sergeant Giron and the County under Myers.

While Plaintiff's opposition brief references purported First Amendment retaliation claims based on her mother's prior interactions with officers, Plaintiff does not cite a single case concerning First Amendment retaliation claims, set out the relevant elements for such claims, or explain how those elements have been plausibly pled here, particularly with respect to Sergeant Giron and the Special Victims Unit's investigation. The Court is not required to make arguments for a represented party such as Plaintiff. Plaintiff's Complaint crammed a panoply of claims into a single cause of action and then, when given the opportunity to articulate the factual and legal basis for any plausible First Amendment retaliation claims in her opposition papers to the motion to dismiss, failed to do so. Accordingly, the Court finds that Plaintiff has waived or forfeited any argument that her complaint alleges plausible First Amendment retaliation claims. See Stegemann, 701 F. App'x at 38; Lyn, 2007 WL 1876502, at *16,

Moreover, even if the Court to were to overlook Plaintiff's deficient motion papers, the Court finds that Plaintiff has failed to allege any plausible First Amendment retaliation claims against Sergeant Giron and the County arising out of the investigation by the Special Victims Unit.

13

"To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." Dorsett v. Cnty. of Nassau, 732 F.3d 157, 160 (2d Cir. 2013).

First, Plaintiff has not plausibly alleged the requisite third element of a retaliation claim.

A plaintiff can meet the third element by alleging that their speech was chilled, but such chilling is not required. Id. A plaintiff "can show either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm." Id.; see also Searle v. Red Creek Cent. Sch. Dist., No. 22-2049-CV, 2023 WL 3398137, at *2 (2d Cir. May 12, 2023) (characterizing concrete harm as a "narrow substitute" for "actual chilling").

Courts have found similar allegations that defendants failed to investigate and prosecute criminal complaints were insufficient to plausibly allege a First Amendment retaliation claim. See Bailey v. City of Jasper, Tex., No. 12-CV-153, 2012 WL 4969126, at *4–5 (E.D. Tex. Sept. 24, 2012) (finding that defendants' alleged failure to "investigate and prosecute [third-party] as zealously as they should have" was "insufficient to chill a person of ordinary firmness from engaging in protected speech"), report and recommendation adopted, No. 12-CV-153, 2012 WL 4970809 (E.D. Tex. Oct. 17, 2012); Montenegro v. Murphy, No. 22-CV-476, 2023 WL 2606580, at *4 (E.D. Tex. Mar. 3, 2023) (finding that failure to initiate investigation in response to complaints did not constitute concrete injury for purposes of First Amendment retaliation claim and noting that "[c]ourts have found that failure to investigate a plaintiff's criminal complaint would not chill a person of ordinary firmness"); cf. Dorsett, 732 F.3d 157 (finding that County Legislature's allegedly retaliatory delay in approving settlement did not constitute a concrete harm because even though the settlement lost $8 million in value as a result of the delay, the Legislature

14

had the absolute discretion whether to vote on or approve the settlement).[6]  Moreover, even assuming, for the sake of argument, that failure to investigate a criminal complaint could rise to the level of concrete harm in some circumstances, Plaintiff has not plausibly alleged a concrete harm here.  This is not a situation where the Special Victims Unit refused to accept Plaintiff's complaint or a situation where Plaintiff has plausibly alleged that the Special Victims Unit conducted an inadequate investigation.

The Second Circuit has not decided whether "allegations of emotional and psychological harm would establish compensable injury in a First Amendment retaliation claim." Zherka v. Amicone, 634 F.3d 642, 646–47 (2d Cir. 2011).  Here, Plaintiff's brief never asserts that such harms constitute the requisite concrete harm for her First Amendment retaliation claim.  Accordingly, Plaintiff has waived any such argument.

Second, even assuming that Plaintiff suffered the requisite concrete harm—based on the alleged failure to investigate and prosecute, or otherwise—Plaintiff has not plausibly alleged that Sergeant Giron's decision to close the investigation in December 2020 was motivated by any protected speech.  (See Defs.' Reply Mem. at 3 ("[T]he alleged wrongdoing was not as a result of the Plaintiff's speech.").)

The Complaint indicates that the Special Victims' Unit investigation into Plaintiff's claim was pending for more than a year, during which time Plaintiff gave multiple "statements," (Compl.

---

[6] The Second Circuit has suggested that the concrete harm element is met when municipal officials refuse to enforce zoning laws and that refusal causes the plaintiff to suffer other injuries.  See Gagliardi v. Village of Pawling, 18 F.3d 188 (2d Cir.1994) (holding, without explicitly discussing whether plaintiffs suffered concrete harm, that plaintiff alleged First Amendment retaliation claim where municipal defendants refused over many years to enforce "pertinent municipal, zoning, noise and safety ordinances, rules, regulations and laws" against factory that adjoined plaintiff's residentially zoned property); Gill v. Pidlypchak, 389 F.3d 379, 383 (2d Cir. 2004) (explaining that the plaintiff in Gagliardi "apparently survived a motion to dismiss" because they "adequately pleaded non-speech injuries" including "noise pollution").  Here, the closure of the investigation and the determination not to prosecute the alleged perpetrators is not analogous to Gagliardi where specific injuries—such as noise pollution—resulted from the municipality's continued refusal to enforce zoning laws.

¶ 24.)  Plaintiff admits she did not disclose all the relevant facts in the instant Complaint to investigators, and she does not identify what information she told investigators or what information she withheld.[7]  (Compl. ¶ 24.)  Without identifying what information she provided to the Special Victims Unit, Plaintiff cannot, given the record here, plausibly allege that Sergeant Giron discontinued the investigation (and did not pursue a prosecution) due to retaliatory intent rather than due to the specific circumstances of her case.  Moreover, as noted above, Plaintiff's Complaint does not even allege whether or not the investigators questioned (or sought to question) Asman, Pruett, Jake Yedid, Officer Dolan, or anyone else during the year that the investigation was pending.  Plaintiff cannot plausibly allege that Defendants performed an incomplete and inadequate investigation (and should have prosecuted the alleged perpetrators) without saying anything about this critical point.[8]  Instead, Plaintiff's Complaint focuses on the detectives' failure to pursue or rely on other speculative evidence—such as the alleged possibility of Pruett's fingerprints on Plaintiff's phone.  Moreover, the Complaint does not even identify whether Plaintiff told investigators about such evidence during the investigation.

Additionally, there are numerous aspects and complexities of Plaintiff's narrative which would lead law enforcement officials to question whether this would be a viable prosecution absent physical evidence tying Plaintiff to the alleged perpetrators.  These aspects include, among other

---

[7] While Plaintiff's mother reportedly told Sergeant Giron that Plaintiff preferred speaking with a female detective, Plaintiff has not plausibly alleged that Sergeant Giron's alleged refusal to provide a female detective was motivated by protected speech.  Additionally, as noted earlier, the Complaint does not allege that Plaintiff herself ever requested a female detective.

[8] The absence of any allegations in the Complaint concerning whether the police sought to interview Asman and what, if anything, she said to the police are particularly glaring.  Plaintiff's Complaint alleges, without any further explanation, that Asman—an acquaintance of Plaintiff's mother—sexually assaulted her, laughed at Plaintiff when she returned to the house, and then subsequently told Plaintiff not to say anything about what happened that day.  Plaintiff, however, also suggests, in her pre-motion conference letter, that "it may be possible that one or more of [the individuals involved in the crime] was coerced into participating in the crime, upon threat of bodily harm or worse." (ECF No. 17.)  All of this raises obvious questions—was Asman interviewed by investigators and did she confirm or deny Plaintiff's version of events?  The Complaint is utterly silent on these seemingly important facts.

things: (1) the sudden appearance and involvement of the three unknown "African-American men"; (2) the unexplained participation of Asman—an acquaintance of Plaintiff's mother who earlier that day was helping Plaintiff pack her belongings—in the sexual assault; (3) the assailants' decision to hand Plaintiff a loaded gun; (4) the circumstances of Plaintiff's escape from the house, which involved Plaintiff both kicking Pruett in the scrotum and taking the time to fight to get her phone back before leaving the house; and (5) the decisions of Pruett and Asman to remain in the house after Plaintiff's escape. The Court credits Plaintiff's allegations. However, the complexities of this narrative gave law enforcement officials reason not to bring charges in this case absent, as Sergeant Giron explained, physical evidence tying Plaintiff to the alleged perpetrators. Given these complexities and Plaintiff's admitted reticence in discussing her allegations with investigators, Plaintiff has not plausibly alleged that Sergeant Giron's decision to end the investigation in December 2020 without pursuing charges was motivated by any protected speech by Plaintiff or her mother.

Plaintiff spends most of her opposition focusing on Officer Dolan's conduct. Plaintiff stresses that Officer Dolan's failure to assist Plaintiff was the reason a rape kit was never obtained and why critical physical evidence is now missing. However, as explained earlier, Plaintiff's federal claims against Officer Dolan and the County concerning Officer's Dolan's conduct on November 22, 2017, are time-barred. Plaintiff has not alleged plausible retaliation claims against Sergeant Giron and the County stemming from the subsequent investigation performed by the Special Victims Unit two years later. Plaintiff's Monell claim against the County fails because Plaintiff has not plausibly alleged that an underlying constitutional violation was committed by Sergeant Giron or any other officer in connection with the Special Victims Unit's investigation. See Demosthene v. City of New York, 831 F. App'x 530, 534 (2d Cir. 2020).

17

Accordingly, the federal claims against Sergeant Giron and the remaining claims against County are dismissed.

## C. State Law Claims

Under 28 U.S.C. § 1367(a), "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." However, courts "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c), (c)(3); see Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 245 (2d. Cir. 2011). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). Here, given the absence of any viable federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Accordingly, the Court dismisses those claims without prejudice.

### III. CONCLUSION

For the reasons set forth above, the Court grants Defendants' motion to dismiss. Plaintiff's federal claims are dismissed with prejudice and her state law claims are dismissed without prejudice. The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated:  March 18, 2024
       Central Islip, New York

                                       (/s/ JMA)
                                  JOAN M. AZRACK
                         UNITED STATES DISTRICT JUDGE